UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| Gregorio Castillo, and Fernando Gonzalez<br><br>**Plaintiffs,**<br><br>v.<br><br>The French Bread Factory, Inc.<br><br>**Defendant.** | CIVIL ACTION NO. _____ |

## COMPLAINT

**COME NOW** Plaintiffs Gregorio Castillo (herein "Castillo") and Fernando Gonzalez (herein "Gonzalez") (collectively "Plaintiffs), by counsel, and make the following allegations:

## INTRODUCTION

1. This is an action to recover for unlawful retaliation by Defendant French Bread Factory, Inc. (herein "FBF") in violation of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 215(a)(3), (hereinafter "the Act" or "FLSA").

## JURISDICTION AND VENUE

2. This Court has jurisdiction pursuant to 29 U.S.C. § 215(a)(3) in that the Plaintiffs may bring this action in any appropriate United States District Court.

3. Venue is proper for this Court pursuant to 28 U.S.C. § 1391 and Local Rule 3(B)(4) since the acts and omissions giving rise to this lawsuit have taken place in the Eastern District of Virginia.

4. Defendant is subject to personal jurisdiction in the Commonwealth of Virginia.

## PARTIES

5. Castillo is a resident of Virginia and a former employee of FBF. Castillo was an "employee" as defined in the FLSA.

6. Gonzalez is a resident of Virginia and a former employee of FBF. Gonzalez was an "employee" as defined in the FLSA.

7. FBF is a Virginia Corporation with its principal office in Sterling, Virginia. FBF meets the definition of "employer" as defined in the FLSA.

## FACTUAL ALLEGATIONS

8. Castillo was hired by FBF in or around May 1998 as a baker. Castillo transitioned into the role of delivery driver sometime around 2000.

9. Gonzalez was hired by FBF in or around May 2011 as a delivery driver.

10. FBF drivers drove small delivery trucks provided by FBF and made local deliveries of baked goods along specified driving routes.

11. On February 22, 2018, Castillo and Gonzalez, along with two other FBF employees, Morris Garcia and Jose Morales, brought suit against FBF in the Eastern District of Virginia for violations of the FLSA related to unpaid wages of overtime pursuant to 29 U.S.C. § 216(b) and (c).

12. After the lawsuit was filed, Jose Morales left FBF around April 2018 while the remaining three plaintiffs, Castillo, Gonzalez, and Morris Garcia continued to work for FBF as the overtime case proceeded through litigation.

13. Upon information and belief, Cesar Melendez, the manager of drivers, spoke with

Gonzalez around the end of July 2018 and informed him, among other things, that: (i) the owner of FBF was unhappy with the employees' involvement in the lawsuit; (ii) the owner had told Cesar to closely monitor those involved (i.e. the plaintiffs in the lawsuit) in order to "find a reason to fire [them]"; (iii) Cesar intended to fire all employees involved when the lawsuit was finished regardless.

14. On July 24, 2018, FBF terminated Castillo's employment.

15. On August 10, 2018, FBF terminated Gonzalez's employment.

16. Prior to his termination, Castillo was making deliveries for FBF five days a week. He typically began work as early as 1:15 a.m. and finished work around noon.

17. Castillo's regularly assigned driving route included close to thirty individual stops and included deliveries to the United States Capital Visitor's Center (herein "CVC") and the Supreme Court of the United States (herein "SCOTUS").

18. Deliveries for the CVC were made at an underground loading dock located at 211 New Jersey Avenue, Northwest Washington DC, 20001.

19. Deliveries for the SCOTUS were made off a one-lane road located at 11 2nd Street Northeast Washington DC, 20002, or about 0.5 miles away from the CVC stop.

20. It was Castillo's regular business practice to deliver to the CVC directly before delivering to the SCOTUS.

21. Because of the early-morning traffic in that area of the city, Castillo tried to arrive early to the CVC whenever possible.

22. At the CVC loading dock, a door to the kitchen was opened for deliveries sometime between 6:00 am and 6:30 am. Occasionally, deliveries were accepted earlier than 6:00 am.

23. All deliveries to the SCOTUS were overseen by security guards and subjected to K-9 inspection. Because the SCOTUS did not open until 7:00 am, security typically began inspecting and accepting deliveries around fifteen to twenty minutes before 7:00 am.

24. At the SCOTUS delivery location, there was no convenient place for drivers to park before security was ready for morning delivery inspections.

25. Any vehicle parked on this one-lane road that was not under an active inspection by SCOTUS security was subject to a parking ticket and / or told to move.

26. Accordingly, security at the SCOTUS told Castillo not to arrive at the SCOTUS with deliveries until fifteen to twenty minutes before opening.

27. When Castillo was ahead of schedule, including when CVC opened its kitchen before 6:30a.m., it was his regular business practice to wait in his delivery truck at the CVC loading dock until an appropriate time to leave in order to arrive when SCOTUS security was ready to inspect and accept deliveries.

28. Other FBF drivers also waited at the CVC loading dock until the time when SCOTUS was ready to inspect and accept deliveries.

29. On July 24, 2018, Castillo was accompanied on his delivery route by Suri Perez (herein "Perez"). Perez was a newly hired FBF employee that Castillo had been tasked with training.

30. On that day, Castillo and Perez arrived at the CVC loading dock before 6:00 am and were able to complete their CVC delivery early.

31. Castillo and Perez returned to the delivery van a few minutes after 6:00 am and proceeded to wait at the CVC loading dock until it was time for them to drive over to the SCOTUS.

32. During this period of time, there was nothing else for Castillo or Perez to do except wait inside their parked delivery truck at CVC.

33. Accordingly, Castillo sat and rested in the driver's seat while Perez sat and rested in the passenger's seat. Castillo and Perez spoke briefly. Castillo set a ten-minute alarm on his phone before closing his eyes and briefly dozing off in his seat. Ten minutes later, Castillo's alarm went off. Castillo woke up, started the delivery truck, and left the CVC loading dock with Perez at 6:18 am to head over to the SCOTUS.

34. Castillo and Perez completed the remainder of the route's deliveries on-time and without any noted issues, including that day's delivery to the SCOTUS.

35. At this time, FBF recorded the actions of its delivery drivers using cameras mounted inside its delivery trucks.

36. Video recordings from Castillo's delivery truck on July 24, 2018 support the facts described above.

37. The next day, on July 25th, when Castillo reported to work, he received a letter of termination upon his arrival.

38. The letter claimed that, on July 24th, Castillo had been asleep for 39 minutes while on-duty and that such action was a violation of FBF's "Zero Tolerance Policy" and a "theft of company time". The letter stipulated that Castillo's termination was to be effective immediately and signed by FBF President Lorena Maltez.

39. Castillo met with Human Resources and refuted the claims made against him in the letter. Castillo explained his reason for remaining at the CVC and that this was part of the regular business practice of all FBF drivers on this particular route.

40. HR told Castillo that a video recording from his delivery truck showed him sleeping on the job. Castillo stated he knew of other drivers who also fell asleep at the CVC ahead of their SCOTUS delivery, however HR told Castillo that their decision to terminate him was final.

41. Upon information and belief, when Perez was questioned by HR about this same incident, she denied the allegations FBF made against Castillo and refused to support FBF's account of events. Perez's employment was subsequently terminated by FBF a few days later.

42. Prior to his termination, Gonzalez was making deliveries for FBF six days a week. He typically began work as early as 1:15 a.m. and got off between 11:00 a.m. and 11:45 a.m.

43. Gonzalez typically drove an assigned route that took around eight-and-a-half hours to complete each day.

44. At the end of July, around the same time Castillo was terminated, Gonzalez learned that Cesar Melendez had reassigned Gonzalez's usual delivery route to another employee. The new route Gonzalez was assigned only took around five hours a day to complete.

45. When Gonzalez first asked Cesar Melendez why he had been reassigned and not another driver, Cesar said "Just because".

46. Since FBF could not guarantee its drivers a set number of hours per week, Gonzalez expressed concern that the route reassignment would result in his earning of less hours per week.

47. In response, FBF told Gonzalez that his hours would not be cut and that his reassignment was merely to cover the route of a driver who had been terminated and that Gonzalez had been assigned to it because he was a "senior driver" who was familiar with that vacant route.

48. When Gonzalez would finish driving the shorter, newly assigned route, FBF management had Gonzalez perform additional afternoon deliveries or instead, required him to

complete miscellaneous tasks and clean-up around the office.

49. On August 9, 2018, Lorena Maltez told Gonzalez to pick up some carpets on the floor of the office and to take them out to the garage for storage. When Gonzalez expressed concern with being asked to do tasks unrelated to his job as a delivery driver, Lorena told Gonzalez to go wash all of the delivery trucks instead.

50. Gonzalez had never before been asked to wash all of the other driver delivery trucks.

51. It was within FBF's regular business practices to have each driver wash his/her own vehicle.

52. Accordingly, on August 9th, Gonzalez, washed his own delivery truck before clocking out and going home.

53. The next day, on August 10th, Gonzalez reported to work and noticed that his name was not on the check-in list of drivers. Cesar Melendez approached Gonzalez and told him that he had been "terminated for insubordination" from the day before. Gonzalez requested an official termination letter and was told by Cesar that it be would be mailed to him.

54. Later on that same day, after Gonzalez had been terminated, Cesar Melendez spoke with Gonzalez again. Cesar told Gonzalez that the FBF owner was still upset with him and the other employees who were involved in the overtime lawsuit. Cesar told Gonzalez that the owner had told him to fire Gonzalez because of the lawsuit. Additionally, Cesar indicated that Morris Garcia would be the next one to be fired and that they planned to supervise him closely over the next week in order to find a reason to fire him.

55. Upon information and belief, soon thereafter, FBF proceeded to reassign Morris

Garcia's typical driving route in the same manner that they had reassigned Gonzalez's route as a way to "set-up" Morris Garcia.

56. Before going to trial, the employees in the overtime lawsuit, including Castillo and Gonzalez, and FBF reached a settlement agreement with regards to the alleged FLSA wage violations on September 12, 2018. The settlement agreement between the parties explicitly excluded any FLSA retaliation claims by Plaintiffs from the scope of the settlement agreement.

### FLSA VIOLATION - RETALIATION

57. Plaintiffs incorporate by reference and re-allege the preceding paragraphs as though fully set forth herein.

58. Plaintiffs' job duties, and the job duties or those similarly situated to Plaintiffs, are not exempt from the coverage of the FLSA.

59. At all relevant times, Plaintiffs were entitled to the rights, protections, and benefits provided under the FLSA.

60. As employees, Castillo's and Gonzalez's participation in the lawsuit against FBF, their then current employer, for unpaid overtime constituted a protected activity under the FLSA.

61. Prior to the lawsuit being settled out-of-court, both Castillo and Gonzalez were abruptly terminated by FBF.

62. FBF's reasons for terminating Castillo and Gonzalez were each factually inaccurate and made under pretext.

63. Comments made by Cesar Melendez make clear that FBF was planning to terminate these employees because of their involvement in the lawsuit demonstrates direct evidence of a causal connection between Plaintiffs' protected participation in the overtime lawsuit and their

terminations by FBF.

64. FBF showed a reckless disregard for Plaintiffs' right to be free from retaliation for filing a lawful claim under the FLSA. FBF's actions against Castillo and Gonzalez demonstrate a retaliatory animus against its employees who had asserted their right to bring a claim under the FLSA. Accordingly, FBF intentionally and/or willfully violated Castillo's and Gonzalez's right to be free from retaliation under the FLSA.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs request the following Relief against Defendant:

A. Compensatory damages for lost wages, plus an equivalent amount of liquidated damages, along with pre-judgment interest;

B. Compensatory damages for said retaliation in an amount to be determined by the jury;

C. Punitive damages for said retaliation in amount to be determined by the jury;

D. Reasonable attorneys' fees and costs expended in the prosecution of this case;

E. Any and all further relief permissible by law.

Plaintiff hereby demands **TRIAL BY JURY**.

**Respectfully submitted,**
**Gregorio Castillo and Fernando Gonzalez**
**Plaintiffs**

By: \_\_\_/s/_____
Craig Juraj Curwood (VSB No. 43975)
Curwood Law Firm, PLC
530 E. Main Street, Suite 710
Richmond, VA 23219
Telephone: (804) 788-0808
Fax: (804) 767-6777
ccurwood@curwoodlaw.com
*Counsel for Plaintiffs*